**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ANMED HEALTH
800 North Fant Street
Anderson, South Carolina 29621

ATLANTICARE REGIONAL MEDICAL CENTER, INC.
d/b/a Atlanticare Regional Medical Center – City Campus
65 West Jimmie Leeds Road
Pomona, New Jersey 08240

CAPITAL HEALTH SYSTEM INC.
d/b/a Capital Health Medical Center-Hopewell
One Capital Way
Pennington, New Jersey 08534

CAPITAL HEALTH SYSTEM INC.
d/b/a Capital Health Regional Medical Center
750 Brunswick Avenue
Trenton, New Jersey 08638

Case No. 26-CV-1620

ENGLEWOOD HOSPITAL AND MEDICAL
CENTER, INC.
350 Engle Street
Englewood, New Jersey 07631

EPISCOPAL HEALTH SERVICES, INC.
d/b/a St. John's Episcopal Hospital at South Shore
327 Beach 19th Street
Far Rockaway, New York 11691

FORREST COUNTY GENERAL HOSPITAL
d/b/a Forrest General Hospital
6051 U.S. Highway 49
Hattiesburg, Mississippi 39401

HMH HOSPITALS CORPORATION
d/b/a Jersey Shore University Medical Center
1945 Corlies Avenue
Neptune, New Jersey 07753

HMH HOSPITALS CORPORATION
d/b/a JFK Medical Center
65 James Street
Edson, New Jersey 08820

1

HMH HOSPITALS CORPORATION
d/b/a Palisades Medical Center
7600 River Road
North Bergen, New Jersey 07047

HMH HOSPITALS CORPORATION
d/b/a Raritan Bay Medical Center
530 New Brunswick Avenue
Perth Amboy, New Jersey 08861

HMH HOSPITALS CORPORATION
Successor in Interest to JFK Health
d/b/a Muhlenberg Regional Medical Center
343 Thornall St.
Neptune, New Jersey 07753

HOLY NAME MEDICAL CENTER, INC.
718 Teaneck Road
Teaneck, New Jersey 07666

HUDSON HOSPITAL OPCO, LLC
d/b/a CarePoint Health - Christ Hospital
176 Palisade Avenue
Jersey City, New Jersey 07306

HUMC OPCO, LLC
d/b/a CarePoint Health - Hoboken University
Medical Center
308 Willow Avenue
Hoboken, New Jersey 07030

INSPIRA MEDICAL CENTERS, INC.
d/b/a Inspira Medical Center Vineland
1505 W. Sherman Avenue
Vineland, New Jersey 08360-7059

KENNEDY UNIVERSITY HOSPITALS, INC.
d/b/a Jefferson Stratford Hospital
2201 Chapel Avenue West
Cherry Hill, New Jersey 08002

MEMORIAL HOSPITAL AT GULFPORT
4500 Thirteenth Street
Gulfport, Mississippi 39501

THE MOSES H. CONE MEMORIAL HOSPITAL
OPERATING CORPORATION
d/b/a The Moses H. Cone Memorial Hospital
1200 N. Elm Street
Greensboro, North Carolina 27401

PRISMA HEALTH GREENVILLE MEMORIAL
HOSPITAL
701 Grove Road
Greenville, South Carolina 29605

SINGING RIVER HEALTH SYSTEM
2809 Denny Avenue
Pascagoula, Mississippi 39581

SOUTH NASSAU COMMUNITIES HOSPITAL
d/b/a Mount Sinai South Nassau
One Healthy Way
Oceanside, New York 11572

ST. BARNABAS HOSPITAL
4422 Third Avenue
Bronx, New York 10457

VIRTUA MEMORIAL HOSPITAL OF
BURLINGTON COUNTY, INC.
d/b/a Virtua Mount Holly Hospital
175 Madison Avenue
Mount Holly, New Jersey 08060

VIRTUA WEST JERSEY HEALTH SYSTEM INC.
d/b/a West Jersey Hospital
100 Bowman Drive
Voorhees, New Jersey 08043

                      Plaintiffs,

v.

ROBERT F. KENNEDY, JR., Secretary,
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

                      Defendant.

3

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY AND INJUNCTIVE RELIEF UNDER THE MEDICARE STATUTE

### NATURE OF ACTION

1. Plaintiffs (identified above and in paragraph 11 and referred to collectively as "Plaintiff Hospitals") commence this action to request judicial review of an unlawful administrative policy involving Medicare reimbursement to hospitals. More specifically, this case concerns the proper treatment in calculating the Medicare disproportionate share hospital ("DSH") payments to hospitals and, in particular, the proper treatment in the DSH calculation of inpatient hospital days for patients enrolled in a Medicare Advantage plan under Part C of the Medicare statute. The ultimate issue presented is whether the Department of Health and Human Services' ("HHS") June 2023 Final Action ("2023 Final Action") is unlawful in retroactively adopting the policy of a vacated 2004 rule that, in calculating DSH payments, included Part C days in the Medicare fraction and excluded them from the numerator of the Medicaid fraction.

2. Although the D.C. Circuit has thrice ruled against the Secretary's continued application of the 2004 policy (with the latest ruling affirmed by the Supreme Court), the Secretary has not acquiesced in any of those decisions.

3. In 2011, in *Northeast Hospital Corp. v. Sebelius*, the D.C. Circuit held that the retroactive application of the 2004 rule was impermissible. 657 F.3d 1, 16-17 (D.C. Cir. 2011). Thereafter, in *Allina Health Services v. Sebelius ("Allina I")*, the D.C. Circuit affirmed this Court's decision declaring the 2004 rule procedurally invalid and vacating the rule. 746 F.3d 1102,1111 (D.C. Cir. 2014).

4. In 2017, the D.C. Circuit held that the agency's continued application of the Part C days policy reflected in the 2004 rule was a procedurally invalid "change" from the practice in effect before the vacated 2004 rule, because the Secretary had not engaged in the required notice-

and-comment rulemaking. *Allina Health Servs. v. Price ("Allina II")*, 863 F.3d 937, 944 (D.C. Cir. 2017), *aff'd, Azar v. Allina Health Servs.*, 587 U.S. 566 (2019). In 2019, the Supreme Court upheld the D.C. Circuit's decision in *Allina II. Azar*, 587 U.S. 566.

5.      Despite these decisions, the Secretary has again reinstated the vacated 2004 policy in retroactive rulemaking, applying it to payment determinations for the Plaintiff Hospitals. This action has resulted in significant reductions to the Plaintiff Hospitals' Medicare DSH payments and created financial uncertainty for facilities that serve high volumes of low-income patients.

6.      The 2023 Final Action is impermissible as it disregards the rulings of *Northeast Hospital*, *Allina I*, and *Allina II*, is contrary to the law, exceeding the agency's retroactive rulemaking authority under the Medicare statute, and is arbitrary and capricious.

7.      The Plaintiff Hospitals, therefore, seek an order (i) declaring invalid and setting aside the Secretary's 2023 Final Action and the affected DSH payment determinations, and (ii) directing the Secretary to recalculate the Plaintiff Hospitals' DSH payment determinations according to the pre-2004 policy and to promptly remit all additional amounts due to the Plaintiff Hospitals, plus interest calculated using the original notice of program reimbursement ("NPR") dates for the years at issue.

## JURISDICTION AND VENUE

8.      This action arises under the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

9.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(l).

10.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(l).

## PARTIES

11.     The Plaintiff Hospitals in this action and their fiscal years at issue are as follows:

(a)   AnMed Health, Provider No. 42-0027, fiscal periods ending September 30, 2008, and 2009;

(b)   AtlantiCare Regional Medical Center, Inc. d/b/a Atlanticare Regional Medical Center – City Campus, Provider No. 31-0064, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010, 2011 and 2012;

(c)   Capital Health System Inc. d/b/a Capital Health Medical Center – Hopewell, Provider No. 31-0044, fiscal periods ending December 31, 2006, 2007, 2009, 2010, 2011 and 2012;

(d)   Capital Health System Inc. d/b/a Capital Health Regional Medical Center, Provider No. 31-0092, fiscal periods ending December 31, 2006, 2007, 2009, 2010, 2011 and 2012;

(e)   Englewood Hospital and Medical Center, Inc., Provider No. 31-0045, fiscal periods ending December 31, 2006, 2008 and 2009;

(f)   Episcopal Health Services, Inc. d/b/a St. John's Episcopal Hospital at South Shore, Provider No. 33-0395, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010 and 2011;

(g)   Forrest County General Hospital d/b/a Forrest General Hospital, Provider No. 25-0078, fiscal periods ending September 30, 2008, 2011 and 2012;

(h)   HMH Hospitals Corporation d/b/a Jersey Shore University Medical Center, Provider No. 31-0073, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010, 2011 and 2012;

(i)    HMH Hospitals Corporation d/b/a JFK Medical Center, Provider No. 31-0108, fiscal period ending December 31, 2012;

(j)   HMH Hospitals Corporation d/b/a Palisades Medical Center, Provider No. 31-0003, fiscal periods ending January 1, 2006 and December 31, 2008, 2009, 2010, 2011 and 2012;

(k)   HMH Hospitals Corporation d/b/a Raritan Bay Medical Center, Provider No. 31-0039, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010, 2011 and 2012;

(l)   HMH Hospitals Corporation, Successor in Interest to JFK Health d/b/a Muhlenberg Regional Medical Center, Provider No. 31-0063, fiscal periods ending December 31, 2005, 2006 and August 13, 2008;

(m)   Holy Name Medical Center, Inc., Provider No. 31-0008, fiscal periods ending December 31, 2006, 2008, 2009, 2010 and 2011;

6

(n) Hudson Hospital OPCO, LLC d/b/a CarePoint Health – Christ Hospital, Provider No. 31-0016, fiscal period ending December 31, 2005;

(o) HUMC OPCO, LLC d/b/a CarePoint Health – Hoboken University Medical Center, Provider No. 31-0040, fiscal period ending August 31, 2006;

(p) Inspira Medical Centers, Inc. d/b/a Inspira Medical Center Vineland, Provider No. 31-0032, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010, 2011 and 2012;

(q) Kennedy University Hospitals, Inc. d/b/a Jefferson Stratford Hospital, Provider No. 31-0086, fiscal periods ending December 31, 2005, 2006, 2008, 2009, 2010, and 2012;

(r) Memorial Hospital at Gulfport, Provider No. 25-0019, fiscal period ending September 30, 2008;

(s) The Moses H. Cone Memorial Hospital Operating Corporation d/b/a The Moses H. Cone Memorial Hospital, Provider No. 34-0091, fiscal periods ending September 30, 2005, 2006, 2008, 2009, 2010 and 2011;

(t) Prisma Health Greenville Memorial Hospital, Provider No. 42-0078, fiscal periods ending September 30, 2006 and 2008;

(u) Singing River Health System, Provider No. 25-0040, fiscal periods ending September 30, 2008 and 2009;

(v) South Nassau Communities Hospital d/b/a Mount Sinai South Nassau, Provider No. 33-0198, fiscal periods ending December 31, 2009, 2010, 2011 and 2012;

(w) St. Barnabas Hospital, Inc., Provider No. 33-0399, fiscal periods ending December 31, 2006, 2008, 2009, 2010, 2011 and 2012;

(x) Virtua Memorial Hospital of Burlington County, Inc. d/b/a Virtua Mount Holly Hospital, Provider No. 31-0057, fiscal periods ending December 31, 2007, 2008, 2009, 2010, 2011 and 2012;

(y) Virtua West Jersey Health System Inc. d/b/a West Jersey Hospital, Provider No. 31-0022, fiscal periods ending December 31, 2007, 2008, 2009, 2010 and 2011.

12. Defendant Robert F. Kennedy, Jr., (referred to herein as the "Secretary") is sued in his official capacity as Secretary of the United States Department of Health and Human Services, the federal agency that administers the Medicare program. References to the Secretary herein are

7

meant to refer to him, his subordinates, his official predecessors or successors, and the department and its components that he oversees, as the context requires.

13. The Centers for Medicare & Medicaid Services ("CMS") is a component of the Secretary's agency, delegated with responsibility for the day-to-day administration of the Medicare program. References to CMS herein include its predecessors.

## LEGAL AND REGULATORY BACKGROUND
### DSH Payments under Medicare Part A

14. Medicare is a federally-funded health insurance program primarily for individuals age 65 and older. *See* 42 U.S.C. § 1395 et seq.

15. Medicaid is a joint federal and state health insurance program primarily for low-income individuals. *See* 42 U.S.C. § 1396 et seq.

16. An individual who is eligible for both the Medicare and Medicaid programs is referred to as a "dual eligible."

17. The Medicare program consists of several "parts," two of which are relevant to this action. "Medicare Part A" covers inpatient hospital services. 42 U.S.C. § 1395d(a)(1). Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under the prospective payment system ("PPS"). *Id.* § 1395ww(d); 42 C.F.R. pt. 412. Under the PPS, Medicare pays predetermined, standardized amounts per discharge, subject to certain payment adjustments. *Id.* One of the PPS payment adjustments is the DSH adjustment. *See* 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

18. A hospital that serves a disproportionate share of low-income patients is entitled to an upward percentage adjustment to the standard PPS rates per discharge. *See* 42 U.S.C. § 1395ww(d)(5)(F); *see also* 42 C.F.R. § 412.106. A hospital may qualify for a DSH adjustment based on its "disproportionate patient percentage." *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(i)(I),

8

(d)(5)(F)(v); 42 C.F.R. § 412.106(c)(1). The disproportionate patient percentage determines both a hospital's qualification for the DSH payment and the amount of the payment. *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(iv), (vii)—(xiii); 42 C.F.R. § 412.106(d). The disproportionate patient percentage is defined as the sum of two fractions expressed as percentages. 42 U. S.C. § 1395ww(d)(5)(F)(vi).

19.    One fraction that is used to compute the DSH payment is commonly known as the "Medicaid fraction." The statute defines the Medicaid fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid statute, title XIX of the Social Security Act], but who were *not entitled to benefits under part A* of [the Medicare statute] and the denominator of which is the total number of the hospital's patient days for such period.

*Id*. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). As reflected in the italicized language, the numerator of the Medicaid fraction consists of the inpatient hospital days of patients who were both eligible for medical assistance under the Medicaid Act and "not entitled to benefits under part A" of the Medicare statute. *Id*.

20.    The other fraction that is used to compute the DSH payment is the "Medicare part A/SSI fraction" or "SSI fraction." The statute defines this fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of [the Medicare statute] and were entitled to supplementary security income benefits (excluding any State supplementation) . . . and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) *were entitled to benefits underpart A* of [the Medicare statute] . . . .

*Id*. § 1395ww(d)(5)(F)(vi)(I) (emphases added). As the italicized language indicates, the Medicare Part A/SSI fraction consists solely of days for patients who were "entitled to benefits under part A" of Medicare. The denominator of the Medicare Part A/SSI fraction includes all Medicare Part

A days, and the numerator includes only those Part A days for patients who are also entitled to social security income ("SSI") benefits under title XVI of the Social Security Act.

21. The Medicare Part A/SSI fraction is computed for each federal fiscal year by CMS and must be used to compute a hospital's DSH payment for the cost reporting period beginning in the federal fiscal year. 42 C.F.R. § 412.106(b)(2)-(3).

## **Medicare Part C**

22. The other part of Medicare relevant to this action is "Medicare Part C," commonly known as "Medicare Advantage" (and formerly known as Medicare+Choice or M+C). Under Part C, as an alternative to receiving traditional benefits under Part A, a Medicare beneficiary may elect to receive Medicare benefits through enrollment in a health plan managed by a private equity under a contract with the Secretary, which is called a "Medicare Advantage plan ". 42 U.S.C. § 1395w-21(a)(1); *see also* 63 Fed. Reg. 34968 (June 26, 1998) ("Under section 1851(a)(1), every individual entitled to Medicare Part A and enrolled under Part B ... may elect to receive benefits through *either* the existing Medicare fee-for-service program or a Part C M+C plan.") (emphasis added).

23. "Before 2004, HHS had *not* treated Part C enrollees as 'entitled to benefits under Part A.'" *Allina II,* 863 F.3d at 939 (quoting *NE Hosp.,* 657 F.3d at 15) (emphasis in original)*; see also Allina I*, 746 F.3d at 1106 citing *Ne. Hosp.*, 657 F.3d at 16-17 ("Prior to 2003, the Secretary treated Part C patients as not entitled to benefits under Part A."). The agency's pre-2004 regulation limited the Medicare Part A/SSI fraction to Medicare patient days that were covered, or paid, by Medicare Part A and included other Medicare patient days (not covered under Part A) in the numerator of the Medicaid fraction to the extent that those patients were also eligible for Medicaid. *See* 42 C.F.R. § 412.106(b)(2)(i) (2003); *see also id.* § 409.3 (defining "covered" as services for which payment is authorized). As the Secretary explained when he adopted it, the pre-2004

regulation mandated that only "covered Medicare Part A inpatient days" be included in the Part A/SSI fraction. 51 Fed. Reg. 16772, 16788 (May 6, 1986); *see also* 51 Fed. Reg. 31454, 31460-61 (Sept. 3, 1986) (stating that limiting the Medicaid fraction to inpatient days where "the Medicaid program is the primary payor" was "consistent with" the Part A/SSI fraction being limited to "covered days"); *Cath. Health Initiatives-Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 n.5 (D.C. Cir. 2013) (noting that the pre-2004 regulation unambiguously limited the Part A/SSI fraction to "covered Medicare Part A inpatient days" (quoting 51 Fed. Reg. at 16777).

24.      The Secretary's written guidance prior to 2004 repeatedly expressed the Secretary's policy that Part C days, as days for which patients were not entitled to Part A payment, were to be excluded from the Part A/SSI fraction. *See, e.g., Ne. Hosp.*, 657 F.3d at 15 (describing written guidance). This guidance included instructions to hospitals and program memoranda transmitting the Part A/SSI fractions on an annual basis. *See id.*

25.      The agency's consistent policy and practice, before the adoption of the 2004 rule, was not to include Part C days within the calculation of Part A days. *Ne. Hosp.*, 657 F.3d at 16-17 (Part C days policy announced in 2004 "contradicts [Secretary's] former practice of excluding M+C days from the Medicare fraction."); *Sw. Consulting DSH Medicare + Choice Days Grps. v. BlueCross BlueShield Ass'n*, PRRB Dec. No. 2010—D52, 2010 WL 4211391, at *12 (Sept. 30, 2010), reprinted in Medicare & Medicaid Guide (CCH) ¶ 82,679 (reviewing evidence that from 1999 to 2004, the Secretary "never count[ed] M+C days in the [Medicare] fraction except rarely, and then by mistake").

26.      In a 2003 proposed rule, the Secretary proposed "to clarify" his long-held position that "once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage." 68 Fed. Reg.

11

27154, 27208 (May 19, 2003). Further, the Secretary explained that "[t]hese days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for a [Part C] beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction." *Id.* The Secretary explained that "once a beneficiary has elected to join [a Part C] plan, that beneficiary's benefits are no longer administered under Part A." *Id.*

27.    In the preamble to a final rule adopted in 2004 (the "2004 Rule"), however, the Secretary reversed course and "abruptly announced a change in policy." *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 78 (D.D.C. 2012), *aff'd*, 746 F.3d at 1107-10. That 2004 Rule announced that the Secretary would "adopt a policy" to include Part C days in the Medicare Part A/SSI fraction and exclude them from the Medicaid fraction effective October 1, 2004. 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004); *see also Ne. Hosp.*, 657 F.3d at 16 ("[I]n the 2004 rulemaking [the Secretary] announced that she was 'adopting a policy' of counting [Part C] days in the Medicare fraction." (citing 69 Fed. Reg. at 49099).

28.    In the 2004 Rule, the Secretary amended the regulation text by deleting the word "covered." 69 Fed. Reg. at 49246. However, even after the 2004 Rule, the agency continued its longstanding practice of excluding Part C days from the SSI fraction, a practice dating back to the inception of the Part C program in 1998. Consistent with that approach, the SSI fractions CMS transmitted for federal fiscal years 2005 and 2006 also excluded Part C days. *See* CMS Pub. 100-04, Transmittal 1091 (Oct. 27, 2006), *reprinted* in Medicare & Medicaid Guide (CCH) ¶ 156,277 (transmitting federal fiscal year 2005 Part A/SSI fractions and specifying that the fractions include only "covered Medicare days," and referring to the ratio of SSI days and "covered Medicare days" as "the ratio of Medicare Part A patient days attributable to SSI recipients"); CMS Pub. 100-04,

12

Transmittal 1396 (Dec. 14, 2007), reprinted in Medicare & Medicaid (CCH) ¶ 156,930 (same for federal fiscal year 2006 fractions).

29.    In July 2007, CMS issued a revision to a Medicare program manual, with a "purported 'effective date' of October 1, 2006," that permitted hospitals to submit the data necessary to implement the Part C days policy. *Allina Health Servs*., 904 F. Supp. 2d at 82.32.

30.    Thereafter, in August 2007, the Secretary amended the text of the DSH regulation governing Part C days without affording hospitals prior notice or opportunity for comment. 72 Fed. Reg. 47130, 47384 (Aug. 22, 2007).

31.    Following the amendments in 2004 and 2007, the regulation provided that the Part A/SSI fraction includes all patient days (not just "covered" days) for "patients entitled to Medicare Part A (or Medicare Advantage (Part C))." *Id.* at 47411 (amending 42 C.F.R. §§ 412.106(b)(2)(i)(B), (iii)(B)) (emphasis added). The amendment of the regulation was made effective October 1, 2007, the beginning of federal fiscal year 2008. *Id.* at 47130; see also *Allina Health Servs*., 904 F. Supp. 2d at 82.

<u>**Prospective Rulemaking Requirements**</u>

32.    Retroactive rulemaking is disfavored in the law, and unless provided for expressly, statutes granting administrative agencies the authority to engage in rulemaking should be construed as extending that authority prospectively only. *See Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.,* 511 U.S. 244, 245 (1994); *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004) ("The aim of the [anti-retroactivity] presumption is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct."); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 438 (2024) (Gorsuch, J., concurring) (criticizing *Chevron* for allowing agencies to "replace one 'reasonable' interpretation

with another at any time, all without any change in the law itself' with "[t]he result: [a]ffected individuals 'can never be sure of their legal rights and duties'" (citation omitted)).

33.     In 1988, the Supreme Court addressed retroactive rulemaking in the Medicare context, holding in *Bowen* that the agency could not exercise its rulemaking authority to issue regulations limiting Medicare reimbursement retroactively. 488 U.S. at 215. In reaching that conclusion, the Supreme Court observed that "[r]etroactivity is not favored in the law" and that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language *requires* this result." *Id.* at 208 (emphases added) (collecting cases). The Court added that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.* (citing *Brimestone R. Co. v. United States*, 276 U.S. 104, 122 (1928)). In his concurrence, Justice Scalia explained that rules apply retroactively if they "alter[] the past legal consequences of past actions" and that when the Secretary in that case prescribed "a formula for costs reimbursable while the prior rule was in effect, she changed the law retroactively." *Id.* at 219-20 (Scalia, J., concurring). Justice Scalia added that a rule that exclusively regulates future behavior may yet be invalid as arbitrary and capricious under the APA if it "makes worthless substantial past investment incurred in reliance upon the prior rule." *Id.* at 220 (citing 5 U.S.C. § 706). He explicitly rejected the Secretary's contention that "the evils generally associated with retroactivity do not apply to reasonable 'curative' rulemaking—that is, the correction of a mistake in an earlier rulemaking proceeding"—as "ha[ving] no basis in the law" and emphasized that he "would assuredly not sanction 'curative' retroactivity." *Id.* at 225. Notably, Justice Scalia opined that permitting such "curative" rulemaking "would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with

14

impunity if, upon invalidation of a rule, they were free to "reissue" that rule on a retroactive basis.''' *Id.* (alteration in original) (citation omitted).

34.    Later, in 1994, the Supreme Court observed that "[t]he presumption against statutory retroactivity is founded upon elementary considerations of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 245. The Court explained that "the antiretroactivity principle finds expression in several provisions of our Constitution" including the Ex Post Facto and Due Process Clauses as well as the prohibitions on Bills of Attainder. *See id.* at 266. The Court added that even if the "retroactive application of a new statute would vindicate its purpose more fully[,] . . . [t]hat consideration . . . is not sufficient to rebut the presumption against retroactivity" because "[s]tatutes are seldom crafted to pursue a single goal" and "[a] legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute." *Id.* at 285-86 (footnote omitted).

35.    As is relevant here, in 2003, Congress revised 42 U.S.C. § 1395hh(e)(1) to prohibit the agency from retroactively effectuating rules or policies adopting new substantive standards "unless the Secretary determines that" one of two very narrow exceptions are met, namely, when "such retroactive application is necessary to comply with statutory requirements," *Id.* § 1395hh(e)(1)(A)(i), or where the "failure to apply the change retroactively would be contrary to the public interest." *Id.* § 1395hh(e)(1)(A)(ii).

36.    Congress enacted this provision expressly to limit CMS's power to undertake retroactive rulemaking. Before the 2003 amendment, the Medicare statute was silent regarding retroactive rulemaking. Despite Supreme Court precedent imposing a presumption against retroactivity when statutes are silent, CMS continued to engage in such retroactive rulemaking.

15

*See Landgraf*, 511 U.S. at 265-66. Industry leaders warned Congress about the harmful effects of retroactive rulemaking, explaining that such policies had previously created significant operational challenges for providers. *See The Medicare Regulatory and Contracting Reform Act of 2001: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 100th Cong. 54 (2001) (statement of Susan Wilson, Vice President, Clinical Operations, and Chief Operating Officer, VNA of Central Connecticut, Inc., New Britain, Connecticut; President, Board of Directors, Connecticut Association for Home Care, Wallingford, Connecticut; and Member, National Association for Home Care testifying about 2001 proposed text, which mirrored text adopted in 2003). Aware that CMS was exploiting the Medicare statute's silence to make retroactive changes in substantive payment standards, Congress responded in 2003 by enacting section 1395hh(e)(1) to "ensure that Medicare's rules are not generally applied retroactively." H.R. Rep. No. 108-74(I), pt. 1, at 42 (2003) (Conf. Rep.); *Medicare Regulatory and Contracting Reform Act of 2001, Hearing on H.R. 3391 before the House of Representatives*, 107th Cong. 8793 (2001) (statement of Rep. Nancy Lee Johnson) (legislative history to Medicare retroactive rulemaking provision stating that the provision was intended to "prohibit[] the government from reimposing regulations retroactively" and from "changing the rules of the game and then punishing providers for noncompliance").

37.     The Medicare statute also provides that "a substantive change . . . shall not become effective before the end of the 30-day period that begins on the date that the Secretary has issued or published . . . the substantive change." 42 U.S.C. § 1395hh(e)(1)(B)(i). The statute, however, permits the change to take effect before that 30-day period "if the Secretary finds that waiver of such 30-day period is necessary to comply with statutory requirements or that the application of such 30-day period is contrary to the public interest." *Id.* § 1395hh(e)(1)(B)(ii). The Medicare

statute further states that "[n]o action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change." *Id.* § 1395hh(e)(1)(C).

38.    In addition, the Medicare statute and implementing regulations provide for finality of claims payment determinations by restricting the untimely reopening and revision of a claim payment determination. *See* 42 U.S.C. § 1395gg(c); 42 C.F.R. § 405.980(b). In particular, the "without fault" provision of the Medicare statute provides that, absent a showing of fault, the agency may not recoup an alleged overpayment from a hospital more than five years after an initial payment determination was made. *See* 42 U.S.C. § 1395gg(c). As the Medicare Financial Management Manual explains, Congress deems such recovery to be "against . . . good conscience":

> There are special rules that apply when an overpayment is discovered subsequent to the fifth year following the year in which notice was sent that the amount was paid. Ordinarily, the provider or beneficiary will be considered without fault unless there is evidence to the contrary. In the absence of evidence to the contrary, the [Medicare Administrative Contractor] will not demand and recover the determined overpayment.

CMS, Medicare Financial Management Manual (Pub. 100-06), ch. 3, §§ 70.3, 80 (May 22, 2025), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/fin106c03.pdf. Initial claims payment determinations are otherwise subject to reopening for four years, but following that period, they cannot be revised in the absence of fraud or similar fault, a clerical error that was unfavorable to the beneficiary or hospital, or as necessary pursuant to other statutes and regulations governing appeals. *See* 42 C.F.R. § 405.980(b).

## The *Northeast Hospital* Litigation

39.    The agency's change to the DSH payment calculation through the 2004 Rule has given rise to substantial litigation. Initially, the agency attempted to apply the 2004 Rule change retroactively to cost years prior to the rule's October 1, 2004 effective date. On September 13,

17

2011, the D.C. Circuit found that the agency's retroactive application of the 2004 Rule to periods prior to October 1, 2004, violated the prohibition on retroactivity because it "change[d] the legal consequences of treating low-income patients." *See Ne. Hosp.*, 657 F.3d at 13-17. The Court held that "the Secretary's present interpretation, which marks a substantive departure from her prior practice of excluding [Part C] days from the Medicare fraction, may not be retroactively applied" to the fiscal years at issue. *Id.* at 17.

40.     The Court also adopted the Secretary's position that the Medicare DSH statute is ambiguous and does not require any specific treatment of Part C days in the DSH calculation. *Ne. Hosp.*, 657 F.3d at 11. In particular, the Court concluded that "Congress has not clearly foreclosed the Secretary's interpretation that [Part C] enrollees are entitled to benefits under Part A[,]" and that "[r]ather, it has left a statutory gap, and it is for the Secretary, not the court, to fill that gap." *Id.* at 13 (citing *Catawba County v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009)). Moreover, although the agency ultimately contended that the 2004 Rule "codified a longstanding policy," the Court found that its "treatment of [Part C] days prior to 2004… belie[d] [that] claim ." *Id.* at 15. The record confirmed, according to the Court, that "the Secretary routinely *excluded* [Part C] days from the Medicare fraction" and that "she changed her interpretation of the DSH provision in 2004." *Id.* at 15-16 (citations omitted). The Court also rejected the agency's contention that its "routine[] fail[ure] to count [Part C] patient days in the Medicare fraction prior to 2004" was a "result of data system errors." *Id.* The Court found that argument "not convincing" given the agency's pre-2004 written guidance, its contemporaneous description of the 2004 Rule as newly "'adopting a policy' of counting [Part C] days in the Medicare fraction" and its 2007 description of the 2004 Rule as announcing a "policy change." *Id.* (citing 72 Fed. Reg. 47130, 47384 (Aug. 22, 2007)). Finally,

the Court explained that "the practical consequences of this dispute number in the hundreds of millions of dollars." *Id.* at 5.

41.     In his concurrence, then Judge Kavanaugh opined that the plain language of the statute unambiguously foreclosed the agency's interpretation because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day." *Ne. Hosp.*, 657 F.3d at 24 (Kavanaugh, J., concurring). This is because, he explained, "entitlement" means "*to have payment made*," and "a Medicare patient enrolled in a Part C plan does not have the right 'to have payment made under, and subject to the limitations in, [Medicare] part A.'" *Id.* at 20 (alteration in original) (footnote omitted). He noted that "[t]he only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible." *Id.* at 20 n. 1. Like the Majority, he found that the agency "interpreted the statute as the Hospital does here" until 2004, when it "abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to Medicare providers (and beneficiaries) in light of the country's increasingly precarious fiscal situation." *Id.* at 21. Judge Kavanaugh also emphasized that "this statute does not permit HHS to pursue fiscal balance on the backs of Medicare providers and beneficiaries in this way." *Id.*

42.     The agency acquiesced in *Northeast Hospital* in June 2012 through TDL-12391. TDL 12391, 06-06-12 (June 12, 2012). The transmittal provided that in light of the Northeast Hospital decision, Medicare contractors must "include any disallowed patient days attributable to patients who were enrolled in a Medicare Part C Plan and also eligible for Medicaid for discharges occurring on or after January 1, 1999 through September 30, 2004 in the Medicaid fraction" of the DSH calculation. *Id.* at 1. The agency specified that this relief should be applied to any cost reports

that were not yet settled, as well as settled cost reports where the hospitals had filed proper appeals. *Id.* at 1-2.

## The *Allina I* Litigation

43.     In July 2009, the Secretary published Part A/SSI fractions for hospital cost reporting periods beginning in federal fiscal year 2007. These fractions for the first time included Part C days. *See* CMS Pub. 100-04, Transmittal 1396 (Dec. 14, 2007), reprinted in MMG ¶ 156,930 (transmitting FFY 2006 fractions); CMS, Disproportionate Share Hospital (DSH) (May 6, 2010), https://web.archive.org/web/20100513052149/http:/www.cms.gov:80/AcuteInpatientPPS/05_dsh .asp.

44.     In *Allina I*, hospitals challenged the applicability of the 2004 Rule on the treatment of Part C days in the DSH payment calculation for cost reporting periods beginning in federal fiscal year 2007, contending, among other things, that the abrupt reversal in policy did not comply with notice-and-comment requirements and was not the product of reasoned decision making because the agency failed to acknowledge or explain its departure from past policy.

45.     This Court agreed and held that the Part C days policy announced in the 2004 Rule was not a logical outgrowth of the 2003 proposed rule. *Allina I,* 904 F. Supp. 2d at 89-92. This Court also held that the "cursory explanation in the 2004 Final Rule [for the reversal in policy] failed to meet the requirements of the APA" because "the Secretary[] fail[ed] to acknowledge her about- face,'" and "her reasoning for the change was brief and unconvincing." *Id*. at 93 (quoting *Ne. Hosp.,* 657 F.3d at 15). Accordingly, this Court concluded that "[t]he portion of the 2004 Final Rule ... that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in

2010, will be vacated, and the case will be remanded to the Secretary for further action consistent with this Opinion." *Id*. at 95.

46.     While the Secretary's appeal from this Court's decision in *Allina I* was pending before the Court of Appeals, the agency engaged in a new rulemaking on the treatment of Part C days in calculating DSH payments, effective only prospectively, beginning October 1, 2013. In that rulemaking, the agency "proposed to readopt the policy of counting the days of patients enrolled in [Part C] plans in the Medicare fraction" "in an abundance of caution." 78 Fed. Reg. 50496, 50615 (Aug. 19, 2013). The resulting rule governing the DSH payment calculation, effective October 1, 2013, is indistinguishable from the 2004 Rule. *See id.* at 50619 (rule "readopt[ion]" applies to "FY 2014 and subsequent years").

47.     On April 1, 2014, the D.C. Circuit affirmed this Court's *Allina I* decision on the merits, "agree[ing] with the district court that the Secretary's final rule was not a logical outgrowth of the proposed rule." 746 F.3d at 1109. Because this procedural failure was a sufficient basis to vacate the rule, the D.C. Circuit did not reach the arbitrariness of the Secretary's explanation. *Id.* at 1111.

48.     With respect to remedy, the D.C. Circuit held that this Court "correctly concluded that vacatur was warranted." *Id.* The Circuit reversed, however, a part of this Court's order that required "the Secretary to recalculate the hospitals' reimbursements 'without using the interpretation set forth in the 2004 Final Rule.'" *Id.* (quoting the Post-Judgment Order). The Court of Appeals instead remanded, explaining that the "question whether the Secretary could reach the same result" on remand as would have applied under the vacated rule "was not before the district court." *Id*.

## The *Allina II* Litigation

49.     In mid-June 2014, the agency published on its website Part A/SSI DSH fractions for federal fiscal year 2012, having included Part C days in the calculation, for all hospitals in the country. The agency provided no explanation for its decision to include Part C days in the Part A/SSI fractions for fiscal year 2012. Instead, the agency issued the fractions exactly as it had for prior years, either applying the 2004 Rule as if the *Allina I* vacatur had never happened or issuing a new rule without notice-and-comment rulemaking. Certain of the plaintiff hospitals in the *Allina I* litigation filed a separate action in this Court challenging the agency's issuance of the FY 2012 Part A/SSI fractions. The Secretary moved to dismiss, asserting that the Secretary's administrative board, the Provider Reimbursement Review Board ("Board") incorrectly granted expedited judicial review, but this Court rejected that motion. This Court then granted the Secretary's motion for summary judgment, *Allina Health Servs. v. Burwell*, 201 F. Supp. 3d 94 (D.D.C. 2016), which the hospitals appealed.

50.     In 2017, the Court of Appeals reversed, agreeing with the hospitals that the Secretary "violated the Medicare Act [statute] by failing to provide for notice and comment" before readopting the Part C days policy from the invalidated 2004 Rule. *Allina II*, 863 F.3d at 942. The Court of Appeals concluded that the Medicare statute, 42 U. S.C. § 1395hh(a)(2), required rulemaking for any "(1) 'rule, requirement, or other statement of policy' that (2) 'establishes or changes' (3) a 'substantive legal standard' that (4) governs 'payment for services,'" and that the Secretary's issuance of the fiscal year 2012 Part A/SSI DSH fractions including Part C days satisfied each of these factors. *Id.* The Court of Appeals also found that the Secretary violated the logical outgrowth requirement of the Medicare statute, 42 U.S.C. § 1395hh(a)(4), which provides that "if a regulation includes 'a provision that is not a logical outgrowth of a previously published

22

notice of proposed rulemaking,' that provision may not become legally operative until it has gone through notice-and-comment rulemaking." *Allina II*, 863 F.3d at 945 (quoting 42 U. S.C. § 1395hh(a)(4)).

51.     The Supreme Court affirmed the Court of Appeals' ruling in *Allina II. Azar*, 587 U.S. 566. The Supreme Court held that the Secretary's 2014 application of the Part C days policy was invalid because it was adopted without notice-and-comment rulemaking under the Medicare statute, 42 U.S.C. § 1395hh(a)(2). *Id.* at 571-80. The Supreme Court's decision did not disturb the Court of Appeals' ruling that the readopted 2004 Rule is invalid under 42 U.S.C. § 1395hh(a)(4), because it was not a logical outgrowth of the proposed rule and therefore required notice-and-comment rulemaking. *Allina II*, 863 F.3d at 945.

### The *Allina III* Litigation

52.     On December 5, 2014, while the *Allina II* litigation was underway, the agency issued a notice that the plaintiff hospital's appeals, along with the appeals from the other hospitals in the *Allina I* case,  were "now before the Administrator of CMS for a determination of the appropriate statutory interpretation in the absence of the vacated 2004 Rule to be used to calculate the Providers' DSH payment with respect to the treatment of the Part C days for [F]FY 2007." Plaintiffs' Opposition to Defendant's Motion to Dismiss Ex. 2 at 2, *Allina Health Servs. v. Burwell (Allina III),* No. 16-cv-150 (D.D.C. May 4, 2016), ECF No. 12-2.

53.     On January 23, 2015, the *Allina I* plaintiffs, submitted comments in response to the agency's notification of review on remand. *See* Defendant's Motion to Dismiss ("Def.'s Mot. to Dismiss") Ex. E at 4-7, *Allina III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9-7 (CMS Administrator decision summarizing the plaintiff hospital's comments). Among other comments, the *Allina I* plaintiffs contended that the pre-2004 standard was reinstated by the vacatur of the

2004 Rule, see Providers' Comments to CMS Administrator on Remand, *Allina Health Servs. v. Blue Cross Blue Shield Ass'n,* Nos. 10-0165G et al. at 18-20 (PRRB Jan. 23, 2015), and that this standard could not be altered until the agency undertook notice-and-comment rulemaking, *see id.* at 21-30. They also argued that the agency's interpretation conflicts with congressional intent, see *id.* at 30-34, and that the agency should interpret "entitled" consistently throughout the Medicare statute, *see id.* at 34-37. The *Allina I* plaintiffs further asserted that public interest favors applying the pre-2004 standard because they made financial decisions in reliance on expected DSH payments consistent with those made under the agency's unchanged policy in the years immediately following the 2004 Rule, until FFY 2008 when the agency first implemented the change. *See id.* at 17, 37-43.

54.    On December 2, 2015, the agency on remand reached the same conclusion as the (vacated) 2004 Rule and issued its "final administrative decision," concluding that "days associated with Medicare patients who are enrolled in a Part C plan are to be included in the numerator and denominator of the Medicare fraction." Def.'s Mot. to Dismiss Ex. E at 46, *Allina III*, No. 16-cv-150. The agency acknowledged, among other things, the Court of Appeals' *Northeast Hospital* holding that "the phrase 'entitled to benefits under part A' is ambiguous." *Id.* at 25 (citation omitted).

55.    On January 29, 2016, the *Allina I* plaintiffs initiated *Allina III* by timely filing a complaint to challenge that "final administrative decision" on remand. *See* Complaint, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 29, 2016), ECF No. 1.

56.    On April 4, 2016, the government filed a partial motion to dismiss, alleging that *Allina I* only concerned the treatment of Part C days in the SSI fraction, and that the *Allina III*

24

plaintiffs should be estopped from expanding their case to address both fractions (the SSI fraction and the Medicaid fraction). *See* Def.'s Mot. to Dismiss, *Allina III*, No. 16-cv-150, ECF No. 9.

57.     The Court issued an opinion denying the government's motion to dismiss. *See* Memorandum Opinion, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 4, 2017), ECF No. 16. The Court concluded that it had jurisdiction to hear the hospitals' challenge to the calculation of both the SSI and the Medicaid fractions, citing the *Allina I* language that "the statute unambiguously requires that Part C days be counted in one fraction or the other." *Id.* at 17 (quoting *Allina I*, 746 F.3d at 1108 (emphasis omitted)). The Court also concluded that the hospitals were not judicially estopped from pursuing the Medicaid fraction challenge. *Id.* at 26.

58.     Subsequently, the parties jointly agreed to stay briefing on the merits pending a final decision in *Allina II*, *see* Joint Status Report, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 16, 2017), ECF No. 18, and the Court stayed the case, *see* Minute Order, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 17, 2017).

59.     The *Allina III* plaintiffs thereafter filed a motion for judgment after the Supreme Court's decision in *Allina II*. *See* Plaintiffs' Motion for Judgment, *Allina III*, No. 16-cv-150 (D.D.C. July 11, 2019), ECF No. 26. The government opposed this motion and cross-moved for a remand to the agency to consider the implications on the case of the Supreme Court's decision. *See* Defendant's Opposition to Plaintiffs' Motion for Judgment and Cross-Motion for Voluntary Remand, *Allina III*, No. 16-cv-150 (D.D.C. July 25, 2019), ECF No. 27.

60.     The Court issued a decision on October 25, 2019, denying the motion for judgment and granting the government's motion for a remand to the agency. *See* Order, *Allina III*, No. 16-cv-150 (D.D.C. Oct. 25, 2019), ECF No. 34. The Court remanded the challenge to the CMS Administrator decision at issue without vacating it. *Id.*; *see* Order at 2, *Allina III*, No. 16-cv-150

(D.D.C. Jan. 2, 2020), ECF No. 40 (clarifying that the October 2019 order "should not have referred to vacatur"); Order, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 2, 2020), ECF No. 41 (amended October 2019 order).

## Subsequent Rulemaking and Implementing Instructions

61.     On August 6, 2020, the agency published a notice of proposed rulemaking that would adopt retroactively for cost reporting periods starting before fiscal year 2014 the same Part C policy -- the policy embodied in the 2004 Rule -- that was vacated in *Allina I* and *Allina II*. *See* 85 Fed. Reg. 47723.

62.     The notice of proposed rulemaking incorrectly claimed that, due to the vacatur of the 2004 Rule, the agency has no rule governing the treatment of Part C days and must, pursuant to the Supreme Court's opinion in *Allina II* requiring notice-and-comment rulemaking, engage in retroactive rulemaking. *Id.* at 47424-25. It made no mention of the pre-2004 Rule, which still governs the treatment of Part C days in the DSH payment following the 2004 Rule's vacatur. The notice claimed two grounds for retroactive rulemaking: (1) to comply with the statutory requirement to calculate Medicare DSH payments, and (2) the "public interest" because, absent retroactive rulemaking, the agency "would be unable to calculate and confirm proper DSH payments for time periods before FY 2014." *Id.* at 47425.

63.     On June 9, 2023, the agency published a Final Action on the treatment of Part C days in the Federal Register, adopting the same policy as proposed. *See* 88 Fed. Reg. 37772 (June 9, 2023) (Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage; Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS); Final Action [CMS-1739-F]).

64.     After retroactively reinstating the vacated 2004 Rule, the agency bypassed Board review and remanded the pending appeals to the Medicare Administrative Contractors ("MACs"). Specifically, on February 21, 2024, CMS issued Change Request 13294, instructing the MACs to implement the 2023 Final Action regarding the treatment of Part C days in the DSH adjustment calculation for periods prior to October 1, 2013, including issuance of certain NPRs and revised notice of program reimbursements ("RNPRs"), by March 25, 2025. *See* CMS, Change Request (CR) to Implement the Medicare Program Final Action: Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, CMS Manual System (Pub. 100-20), Transmittal 12513, CR 13294 (Feb.21,2024), https://www.cms.gov/files/document/r12513otn.pdf. This maneuver restarted the interest clock and prolonged resolution, effectively nullifying years of litigation and delayed recovery of amounts owed.

### *Montefiore Medical Center* **Litigation**

65.     Other hospitals have filed related actions challenging the substantive and procedural validity of the 2023 Final Action as applied to NPRs issued pursuant to Change Request 13294. On September 30, 2025, in the lead case challenging this issue, this Court granted the plaintiff hospital's summary judgment motion and denied the government's cross motion, finding that the 2023 Final Action is impermissibly retroactive as well as arbitrary and capricious under the APA. *See Montefiore Med. Ctr. v. Kennedy*, No. 24-cv-1810, 2025 WL 2801237, at *12-22 (D.D.C. Sept. 30, 2025). The Court held that the rule is "plainly" retroactive, because it changed the "legal standards [that] governed Montefiore's conduct" at the time the services were furnished, *id.* at *14, and the Secretary lacked authority to issue the retroactive 2023 rule because it was neither necessary to comply with HHS's statutory requirement nor would the failure to issue it

have been contrary to the public interest, *id.* at \*15-19. To hold otherwise, the Court reasoned, would open a "floodgate favoring retroactivity." *Id.* at \*18. In addition, the Court held that the 2023 rule is arbitrary and capricious because the agency failed to reasonably address concerns about the financial impact of the rule on hospitals, failing "to explain the assumptions that underlie [its] scant analysis" or "to offer any explanation—let alone a reasonable one—for why the agency" adopted inconsistent positions regarding the potential financial impact of its interpretation "across two lawsuits." *Id.* at \*22.

66.    The Court ordered the parties to submit additional briefing, specifically instructing them to analyze whether vacatur is appropriate under the *Allied-Signal* framework, which considers both the seriousness of the rule's deficiencies and the disruptive consequences of nullifying the rule. *See Montefiore Med. Ctr.*, 2025 WL 2801237, at \*23-24 (applying the framework articulated in *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)).  That briefing was concluded on February 23, 2026.

## Review of Medicare Payment Determinations

67.    After the close of each fiscal year, a hospital is required to file a "cost report" with a MAC designated by the Secretary.

68.    The MAC analyzes a hospital's cost report and issues a year-end determination as to the amount of Medicare program reimbursement due the hospital for services furnished to Medicare patients during the fiscal year covered by the cost report, which includes DSH payments.

69.    The MAC may also reopen a hospital's cost report under certain circumstances and issue a revised determination of Medicare program reimbursement due the hospital.  42 C.F.R. § 405.1885.

28

70.     A hospital may appeal a MAC's determination as to the total amount of Medicare program reimbursement due the hospital to the Board.

71.     A hospital has the right to a hearing before the PRRB if it is dissatisfied with the MAC's payment determination. 42 U.S.C. § 1395oo(a)(1)(A); 42 C.F.R. §§ 405.1835 – 405.1877.

72.     The Medicare statute authorizes the PRRB to determine that it is without authority to decide questions of law relevant to an appeal before the PRRB and grant the right to "expedited judicial review." 42 U.S.C. § 1395oo(f)(1).  Unless modified by the Secretary in accordance with federal law, the PRRB's decision to grant expedited judicial review renders the administrative decision final and subject to judicial review.  *Id.*

## FACTS SPECIFIC TO THIS CASE AND PROCEDURAL POSTURE

73.     Plaintiff Hospitals serve a large number of low-income and vulnerable patients. The funds at issue are critical to their ability to cover uncompensated care, maintain essential services, and support community health programs.  These hospitals have been deprived of millions of dollars in lawfully owed DSH payments as a result of the 2023 Final Action adopting the policy embodied in the 2004 Rule.

74.     Following the publication of CMS's February 1, 2024, instructions, the Plaintiff Hospitals received NPRs or RNPRs applying the 2023 Final Action for each of the cost reporting periods at issue.

75.     The Plaintiff Hospitals timely appealed the NPRs and RNPRs and specifically challenged the validity of the June 2023 Final Action, contesting the determination of the DSH payment amounts due for their cost years at issue on the ground that Part C days were incorrectly counted in the Medicare DSH calculation. The Board assigned those appeals the following case numbers:  25-3682GC, 25-3344GC, 25-3340GC, 25-3758GC, 25-3757GC, 25-3755GC, 25-

29

3753GC, 25-3751GC, 25-3749GC, 25-3587G, 25-3573G, 25-1814G, 25-1392G, 25-1278G, 25-3141G and 25-4641G.

76.     On  February 20, 2026, the Plaintiff Hospitals requested that the Board grant expedited judicial review with respect to the validity of the June 2023 Final Action.

77.     By letter dated March 16, 2026, attached as Exhibit A, the Board granted these requests, finding that the question of the validity of the Part C days policy issue, as set forth in the June 9, 2023 Final Rule, properly falls within the provisions of 42 U.S.C. §1395oo(f)(1).

78.     By the filing of this Complaint, the Plaintiff Hospitals have timely commenced this action for judicial review under 42 U.S.C. §1395oo(f)(1).

## CLAIMS FOR RELIEF

79.     The Medicare statute allows for judicial review of the questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," *i.e.,* the APA. 42 U.S.C. § 1395oo(f)(1).

80.     The applicable provisions of the APA provide that the "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

81.     Under this standard, the 2023 Final Action is invalid, and should be set aside, because the agency's readoption of the Part C policy first published in the 2004 Rule that has been vacated is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory authority, without observance of procedure required by law, and unsupported by substantial evidence, including for the reasons more specifically described below.

30

## COUNT I: RETROACTIVE AGENCY ACTION CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORITY

82.    Plaintiff Hospitals reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

83.    The 2023 Final Action violates the Medicare statute's prohibition on retroactive rulemaking at 42 U.S.C. § 1395hh(e)(1)(A).

84.    Excluding Part C days from the numerator of the Medicaid fraction in the DSH calculation contradicts the Court of Appeals' decision in *Allina I*, which restored the policy of not including Part C days as Part A-entitled days when it vacated the 2004 Rule. *See* 746 F.3d at 1105; *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (finding that because the new rule "modifie[d]" a pre-existing standard, the effect of vacatur was to "automatically resurrect[]" the prior standard); *Croplife Am. v. EPA*, 329 F.3d 876, 879 (D.C. Cir. 2003) (explaining that "[a]s a consequence" of vacating a rule, "the agency's previous practice . . . *is reinstated and remains* in *effect* unless and until it is replaced by a lawfully promulgated regulation" (emphasis added)); *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("[B]y vacating or rescinding the re[s]cissions . . . the judgment of this court had the effect of reinstating the rules previously in force . . . ." (citations omitted)). Given that CMS already established the governing standard through notice-and-comment rulemaking, specifically the inclusion of Part C days in the Medicare fraction in the pre-2004 policy, further notice and comment to establish the standard in the 2023 Final Action was not necessary and is impermissibly retroactive.

85.    The final action also violates the language and intent, and has exceeded the authority, of 42 U.S.C.§1395nn(e).  The agency may not retroactively apply "substantive change[s] in [Medicare] regulations, manual instructions, interpretative rules, statements of

31

policy, or guidelines of general applicability" unless the agency determines that one of two very narrow exceptions are met, namely, when "such retroactive application is necessary to comply with statutory requirements" or where the "failure to apply the change retroactively would be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A). Neither of the narrow exceptions permitting "retroactivity of substantive changes" allows the 2023 Final Action.

86. As this Court recently held, the first narrow "required by statute" exception does not apply. *Montefiore Med. Ctr.*, 2025 WL 2801237, at \*16. The Court of Appeals has held that the DSH statute is ambiguous and does not require any specific treatment of Part C days in the DSH calculation. *See Ne. Hosp.*, 657 F.3d at 11 ("The Secretary points us to other provisions that assume it is possible to be both entitled to benefits under Part A and enrolled in Part C….[W]e conclude that the Medicare statute does not unambiguously foreclose the Secretary's interpretation."); *see Allina I*, 746 F.3d at 1106 ("[T]he phrase 'entitled to benefits under Part A' is ambiguous." (citation omitted)). Indeed, the government has consistently maintained this position. *See, e.g.,* Defendant's Motion for Summary Judgment at 3, 10-11, 14, 44, *Allina I*, 904 F. Supp. 2d 75 (D.D.C. 2012) (No. 10-1463), ECF No. 35; Defendant's Motion for Summary Judgment at 9-10, 19, 21, 23, *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016) (No. 14-1415); *see* 85 Fed. Reg. 47725 (claiming that it met the "required by statute" exception permitting retroactive applicability of a substantive change because "to comply with the statutory requirement to make DSH payments, it is necessary for CMS to engage in retroactive rulemaking to establish a policy to govern" Part C days "for fiscal years before 2014"). To the extent that the agency now maintains that its interpretation is compelled by the DSH statute, the Plaintiff Hospitals contend that the Part C days policy reflected in the 2023 rule is contrary to the plain language of the Medicare DSH statute. *See* 42 U. S.C. § 1395ww(d)(5)(F)(vi)(I)-(II); *Ne. Hosp.*, 657 F.3d at 24

(Kavanaugh, J., concurring) (finding that the plain language of the statute unambiguously foreclosed the agency's interpretation because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day").

87.    Nor can the 2023 Final Action be justified as required by the statutory obligation to make DSH payments. *See* 88 Fed. Reg. at 37777. The agency acknowledges that DSH payments have generally "already been made," *id.* at 37790, and the 1986 regulation limiting "entitled" days to "covered" Part A days allows the agency to exclude Part C days from DSH calculations without further rulemaking, as explained above. Only a change to the policy embodied in the 1986 regulation would require rulemaking. *See supra* ¶ 23. And even if rulemaking were needed, the agency could adopt its pre-2004 policy without retroactive rulemaking. *See Ne. Hosp.*, 657 F.3d at 15 (explaining that "[i]f a new rule is substantively inconsistent with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively" (alteration in original) (internal quotation marks and citation omitted)).

88.    As this Court has held, the second narrow exception to the prohibition on retroactivity -- where failure to apply a change retroactively "would be contrary to the public interest" -- is also not met here. *See Montefiore*, 2025 WL 2801237 at *14. The 2023 Final Action violates fundamental principles of fairness and undermines the strong public interest in advance notice-and-comment rulemaking. Rather than paying Plaintiff Hospitals what they are owed, the agency seeks to readopt the same disapproved policy retroactively, nearly two decades after first attempting it in 2004. *See, e.g., Bowen*, 488 U.S. at 225 (Scalia, J., concurring). The rule also deprives billions of dollars in lawfully owed funds to thousands of hospitals that serve large numbers of low income and vulnerable patients. Historically, CMS has invoked the public-

interest exception only in narrow circumstances, such as to correct technical errors, *see, e.g.*, 69 Fed. Reg. at 78717; 70 Fed. Reg. at 16729; 70 Fed. Reg. at 52025; 70 Fed. Reg. at 76176; 70 Fed. Reg. at 76197; 72 Fed. Reg. at 18913; or to respond to extraordinary events like Hurricane Katrina, when CMS retroactively adjusted GME rules to accommodate displaced residents and stabilize hospital funding. *See* 71 Fed. Reg. at 18663.

89.    The public interest weighs against applying the readopted policy from the vacated 2004 Rule to the 2023 Final Action. Hospitals nationwide, including Plaintiff Hospitals here, made financial decisions in reliance on DSH payments being calculated under the pre-2004 standard, both before the 2007 SSI fractions were issued in 2009 and after the 2012 vacatur of the 2004 Rule for periods before October 1, 2013. *See Montefiore*, 2025 WL 2801237, at *18 (critiquing agency's failure to "grapple with the costs of imposing [the 2023 Rule] retroactively"). Finally, the 2023 Final Action conflicts with the legislative history of Section 1395hh(e), which confirms that Congress enacted this provision in 2003 expressly to limit CMS's power to continue engaging in retroactive rulemaking, not expand it. *See* H.R. Rep. No. 108-391, at 42 (2003) (Conf. Rep.) (enacting 1395hh(e)(1) to "ensure that Medicare's rules are *not* generally applied retroactively" (emphasis added)).

90.    The 2023 Final Action is also inconsistent with both the plain language and intent of the Medicare DSH statute. CMS's construction is not entitled to deference -- rather, the sole question is the "best" reading of the statutory language. *Loper Bright*, 603 U.S. at 400. By applying principles of statutory interpretation, it is clear that the "best" reading of the statute is to include Medicare Part C days in the Medicaid fraction for patients who were eligible for Medicaid and to exclude Part C days from the Medicare Part A/SSI fraction. *See also Ne. Hosp.*, 657 F.3d at 18¬24 (Kavanaugh, J., concurring) (finding that the plain language of the statute

34

unambiguously foreclosed the agency's interpretation of the statute because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day."). The statute requires CMS to isolate hospital days attributable to patients who received payments through Medicare Part A on a particular day and thus the agency must "differentiate Part-C-attributable patient days from Part-A-attributable patient days." *Id*. at 19.

91.     Finally, the agency's interpretation of the statute conflicts with the purpose of the DSH adjustment, which is to provide additional payments under the Part A prospective payment system to hospitals that incur higher costs in treating low-income patients who receive their benefits and coverage under Part A. *See* H.R. Rep. No. 99-241(I), at 15, *reprinted* in 1986 U.S.C.C.A.N. 579, 593-94. Under the agency's current interpretation, however, the government is able to advance "its apparent policy of paying out as little money as possible," but it is not entitled to do so "in derogation of law." *Ne. Hosp*., 657 F.3d at 20 n.1 (Kavanaugh, J., concurring). The "best" reading of the statute includes Medicare Part C days in the Medicaid fraction for patients who were eligible for Medicaid and excludes all Part C days from the Part A/SSI fraction.

## COUNT II: ARBITRARY AND CAPRICIOUS AGENCY ACTION

92.     Plaintiff Hospitals reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

93.     The 2023 Final Action is also arbitrary and capricious and an abuse of discretion. *See* 5 U.S.C. § 706(2).

94.     First, the agency failed to acknowledge that the 2023 Final Action adopting the vacant 2004 Rule is a departure from the pre-existing rule and practice regarding the treatment of Part C days in the DSH payment and has not offered any sufficient explanation for this change.

*See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009) (observing that an agency must "acknowledge and provide an adequate explanation for its departure from established precedent" (citing *Fox*, 556 U.S. at 515)).

95.    CMS claims to be "establish[ing]" a standard of Part C days, requiring retroactive rulemaking. 88 Fed. Reg. at 37774, 37776. Courts, however, have rejected the notion that such action is required here. *See, e.g., Ne. Hosp.*, 657 F.3d at 16; *Allina I*, 904 F. Supp. 2d at 79 ("After implementation of [Part C], 'between 1999 and 2004, the Secretary routinely excluded M+C [inpatient hospital] days from the Medicare [SSI] fraction.'" (citation omitted)). Prior to 2004, the agency excluded Part C days because Part C days are not covered or paid under Part A. *See Allina II*, 863 F.3d at 939 ("Before 2004, [Defendant's agency] had *not* treated Part C enrollees as 'entitled to benefits under Part A.'" (quoting *Ne. Hosp.*, 657 F.3d at 15) (emphasis in original)); *Allina I*, 746 F.3d at 1106; *Montefiore*, 2025 WL 2801237, at *16 (concluding "the Secretary's position" that there was no policy governing part C days prior to 2004 Rule "cannot be squared with the D.C. Circuit's view in *Northeast Hospital*" that a pre-2004 payment standard existed (citations omitted)).

96.    After the 2004 Rule was vacated, the prior policy was automatically reinstated. *See, e.g., United Steel*, 925 F.3d at 1287 (concluding that the effect of vacatur was to "automatically resurrect[]" the prior standard because the new rule "modifie[d]" a pre-existing standard); *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 672 (D.C. Cir. 2006) (Vacatur "restored the status quo ante" (citations omitted)); *Croplife Am.*, 329 F.3d at 879 (vacating rule and holding that "[a]s a consequence, the agency's previous practice . . . is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation"); *Action on Smoking & Health*, 713 F.2d

36

at 797 ("[B]y vacating or rescinding the re[s]cissions . . . the judgment of this court had the effect of reinstating the rules previously in force" (citations omitted)); *Heartland Reg'l Med Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (explaining that vacating a rule "[r]einstated" the prior rule "until the agency repromulgated the same rule").

97.    And under that status quo ante, Part C days were not Part A-entitled. *See Allina II,* 863 F.3d at 939; *Allina I*, 746 F.3d at 1106; *Ne. Hosp*., 657 F.3d at 16 ("confirm[ing] that [the Secretary] changed her interpretation of the DSH provision in 2004"). The pre-2004 practice specifies that the Medicare Part A/SSI fraction includes only "covered" patient days, 42 C.F.R. § 412.106(b)(2)(i) (2003), meaning days paid under Part A. *Id.* § 409.3; *see also Cath. Health Initiatives*, 718 F.3d at 921 n.5. Part C days are not covered by Part A because payment by private Part C Medicare Advantage plans for services furnished to their Part C patients is not payment by Part A. *See* 42 U.S.C. § 1395w-21(a)(1); *Ne. Hosp*., 657 F.3d at 6. Because this rule codifies a policy of counting Part C days for years prior to 2013 (the opposite of the pre-2004 policy), the agency has "depart[ed] from [its] prior policy *subsilentio*[,]" that is, without "display[ing] awareness that it is changing position." *Fox*, 556 U.S. at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). The rule is, therefore, arbitrary and capricious.

98.    Moreover, the agency has departed from its pre-2004 policy without properly considering reliance interests, nor has it accounted for the enormous adverse financial impact on hospitals of the change in policy in the final action. *See, e.g., Altmann*, 541 U.S. at 696 ("The aim of the presumption [against retroactivity] is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct."); *Landgraf*, 511 U.S. at 265 (Kennedy, J., dissenting) ("Elementary considerations of fairness dictate that individuals should have an

opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.").

99.    As a result, the 2023 Final Action also violates the requirements of the Regulatory Flexibility Act, which requires agencies to assess the negative impact of their rules on small business, including hospitals. *See* 5 U.S.C. §§ 604, 605(a) - (b).

100.    The 2023 Final Action is therefore arbitrary and capricious and, consequently, invalid under the APA. *Id*. § 706(2).

## REQUEST FOR RELIEF

101.    The Plaintiff Hospitals request an Order:

a.    declaring invalid and setting aside the agency's final action published in the Federal Register on June 9, 2023 (88 Fed. Reg. 37772);

b.    declaring invalid and setting aside the final payment determinations reflecting the policy of including Part C days in the Medicare Part A/SSI fraction and excluding Medicaid-eligible Part C patient days from the numerator of the Medicaid fraction used to calculate the Plaintiff Hospitals' Medicare DSH calculation for the cost reporting periods at issue;

c.    declaring invalid and setting aside the Medicare Part A/SSI fractions issued by the agency and applied in the final payment determinations at issue here;

d.    directing the agency to recalculate the Plaintiff Hospitals' DSH payments by applying the pre-2004 policy and practice excluding Part C days from the SSI fraction and including Medicaid-eligible Part C patient days in the numerator of the Medicaid fraction,

e.    directing the agency, to make prompt payment of all additional amounts due to the Plaintiff Hospitals under this recalculation, along with interest using the original NPR dates as the basis for calculations in accordance with 42 U.S.C. § 139500(f)(2);

38

f.      requiring the agency to pay legal fees and cost of suit incurred by the Plaintiff Hospitals; and

g.      providing such other relief as the Court may consider appropriate.

Dated: May 12, 2026

Respectfully submitted,

*/s/ Leslie Demaree Goldsmith*
Leslie Demaree Goldsmith
(DC Bar #422759)
Sarah B. Miller
(DC Bar #997286)
**BASS, BERRY & SIMS, PLC**
1201 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20004
Telephone: (202) 827-7083
Leslie.Goldsmith@bassberry.com
SMiller@bassberry.com

*Attorneys for Plaintiffs*

49865597.1

39